CHARLES CARREON, ESQ. (127139)
Attorney for Plaintiff iCall, Inc.
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel:  520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ICALL, INC.,  a Delaware-incorporated Corporation Licensed to do Business in California, | Case No.: CV 10-2206 JW(HRL) |
| Plaintiff, | **MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | Judge:  Hon. James A. Ware |
| RELIANCE COMMUNICATIONS LIMITED, an Indian Corporation, RELIANCE COMMUNICATIONS INTERNATIONAL, INC., a Delaware Corporation Licensed to do Business in California, RELIANCE COMMUNICATIONS (U.K.) Ltd., a United Kingdom Corporation, RELIANCEICALL.COM, *in rem*, RELIANCE GLOBALCOM SERVICES, INC., a Delaware corporation Licensed to do business in California and Does 2 – 5, | Courtroom 8, Fourth Floor<br>Date:  August 23, 2010<br>Time:  10:00 a.m. |
| Defendants. | |

    TO ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN, PLEASE TAKE

NOTICE THAT plaintiff iCall, Inc. will move the Court at 10:00 a.m. on August 23, 2010 for an

order preliminarily enjoining the defendants, and each of them, from infringing the iCall® trademark

separately or in the cojoined "Reliance iCall" formulation, on the RelianceiCall.com

website, or in any other manner, as more fully set forth in the proposed order submitted herewith.

Dated:  July 16 , 2010                    CHARLES CARREON, ESQ.


                                          By:
                                          CHARLES CARREON (127139)
                                          Attorney for Plaintiff ICall, Inc.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iii

ISSUE ............................................................................................................................. 2

I.   INTRODUCTION ...................................................................................................... 2

II.  FACTS ..................................................................................................................... 2

    A.   VoIP Technology and the Voice Communications Market ................................ 2

    B.   Plaintiff's Unique iCall® VoIP Product ......................................................... 3

    C.   The California Wireless VoIP Market ............................................................. 4

    D.   Plaintiff Offers iCall® VoIP Services Using Its Suggestive,
        Registered, Incontestable, iCall® Trademark Through the iCall.Com Website ... 4

        i.    The iCall® Mark Has Been Registered Since October 6, 1998 ............... 4

        ii.   The iCall® Mark Is Suggestive ........................................................... 5

        iii.  The iCall® Mark Is Incontestable ....................................................... 6

    E.   Plaintiff Offers iCall® VoIP Through the iCall.Com Website ......................... 7

    F.   "Project Reliance iCall" -- Designed and Deployed in India, Directed at the U.S.
        Market by Reliance Limited and the Other Reliance Defendants ...................... 7

        i.    The Reliance Defendants' Use of The Inherently-Confusing "Reliance iCall"
            Cojoined Mark and Infringement of the iCall® Mark on the RelianceiCall.com
            Website .......................................................................................... 8

        ii.   Reliance Communications Limited – Indian Corporate Parent and
            RelianceiCall.com Domain Name Owner, Is Infringing the iCall® Mark In
            California Commerce .......................................................................... 9

        iii.  Reliance Communications International, Inc., Reliance Limited California-
            registered Subsidiary, Is Infringing the iCall® Mark ............................ 10

        iv.   Reliance Globalcom Services, Inc. -- California-Based Subsidiary, Co-Infringer
            of the iCall® Mark, and Corporate Agent of All Defendants ................... 11

        v.    Reliance Communications (U.K.), Ltd. -- U.K.-Based Subsidiary Infringing the
            iCall® Mark in California Commerce .................................................. 11

G.    Plaintiff's Prompt Efforts To Halt the Infringement Via UDRP ................................ 12

III.    ARGUMENT .................................................................................................. 12

A.    The Preliminary Injunction Standard ....................................................... 12

B.    The "Internet Trinity" .............................................................................. 13

i.    Application of the Internet Trinity in *Maxim Integrated Products* ................. 13

ii.    The Internet Trinity Factors Weigh In Plaintiff's Favor ......................... 14

1.    Similarity of The Marks ................................................................ 14

2.    Relatedness of the Goods ............................................................. 17

3.    Marketing Channels Used ............................................................ 17

C.    The Remaining Five Sleekcraft Factors ................................................. 17

i.    Strength of the Mark .................................................................... 17

ii.    Defendants' Intent in Selecting Mark .......................................... 18

iii.    Likelihood of Expansion in Other Markets .................................. 19

iv.    Degree of Care Likely to Be Exercised by Consumers ................. 19

v.    Evidence of Actual Confusion ...................................................... 19

D.    The Likelihood of Irreparable Harm ...................................................... 19

E.    Balance of the Equities ........................................................................... 20

F.    Public Policy .......................................................................................... 20

IV.    CONCLUSION ................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abercrombie & Fitch Co. v. Moose Creek, Inc.,* 486 F.3d 629 (9th Cir.2007) ........................... 14

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979) ......................................... 14

*Apple v. Formula Int.,* 752 F.2d 521 (9th Cir. 1984).................................................. 18

*Attrezzi, LLC v. Maytag Corp.,* 436 F.3d 32 (1st Cir. 2006) ...................................... 17

*Century 21 Real Estate Corp. v. Sanlin,* 846 F.2d 1175  (9th Cir. 1988) .................................... 14

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036 (9th Cir.1999) ............. 15

*Cytosport, Inc. v. Vital Pharm., Inc.,* 617 F.Supp. 2d 1051 (E.D.Cal. 2009) ............................. 22

*Dluhos v. Strasberg,* 321 F.3d 365 (3rd Cir. 2003) ..................................................... 13

*Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135 (9th Cir.2002)......................................... 16

*Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 31 U.S.P.A.2d 1592 (3rd Cir.
   1994) ...................................................................................................... 18

*GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199 (9th Cir.2000) ........................................ 14

*Hy-Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (C.C.P.A., 1962) ..................................... 6

*In re Shutts*, 217 USPQ 363 (TTAB 1983)....................................................................... 7

*Interstellar Starship Services v. Epix, Inc.*, 304 F.3d 936 (9th Cir. 2002)................................... 15

*Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352 (9th Cir. 1985) ..................................... 14

*Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d 1024, 1031 (NDCAL 2009) ....... 14

*Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 (7th Cir. 1982) ..................................... 6

*Moroccanoil, Inc. v. Moroccan Gold, LLC,* 590 F.Supp.2d 1271, 1282 (C.D.Cal.2008) ............ 22

*Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 198 (3rd Cir. 1990).............. 22

*Pepsico, Inc. v. The Grapette Company, Inc.,* 416 F.2d 285 (8th Cir. 1969) ................................ 6

*Perfumebay.com, Inc. v. eBay, Inc.,* 506 F.3d 1165, 1174 (9th Cir. 2007) .................................. 15

*Retail Services Inc. v. Freebies Publishing,* 364 F.3d 535 (4th Cir. 2004) ................................. 13

*Sallen v. Corinthians Licenciamentos Ltda*, 273 F.3d 14, 18 (3rd Cir. 2001) ............................. 13

*Winter v. Natural Resources Defense Council,* ___U.S. ___, 129 S.Ct. 365, 172 L.Ed.2d 249
   (2008).................................................................................................... 14

### <u>Rules & Statutes</u>

15 U.S.C. § 1114(1)(a)................................................................................................. 14

15 U.S.C. § 1114(2)(D)(v).......................................................................................... 13

15 U.S.C. §1052(f)...................................................................................................... 7

F.R.Civ.P. 65............................................................................................................. 14

F.R.E. 201(b)(2) and (d) ............................................................................................. 6

TMEP §§1212............................................................................................................ 7

TMEP §1209.01(a) ..................................................................................................... 6

TMEP §1209.01(b) ..................................................................................................... 7

## ISSUE

Whether, in support of its request for an injunction barring Defendants from marketing competing products using the iCall® mark individually, in the cojoined "Reliance iCall" formulation, in the RelianceiCall.com domain name, and on the RelianceiCall.com website, Plaintiff has shown (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent a preliminary injunction, (3) that the balance of equities tips in favor of issuing an injunction and (4) that an injunction is in the public interest.

## I.   INTRODUCTION

Plaintiff is the registered owner of the incontestable iCall® mark, that it utilizes to offer Voice-Over Internet Protocol ("VoIP") services through its iCall.Com website. Defendants have established a website at RelianceiCall.com that utilizes the iCall® mark, singly and cojoined in the Reliance iCall mark, to market competing long-distance and VoIP services over the Internet, ostensibly to the "Indian-expatriate" market. Plaintiff contends that the conduct of the Defendants infringes its rights under the Lanham Act, and seeks a preliminary injunction restraining Defendants from utilizing the iCall® trademark in any fashion, singly or in the cojoined Reliance iCall formulation, on the Internet at the RelianceiCall.com website, or in any marketing venue whatsoever.

## II.   FACTS

### A.   VoIP Technology and the Voice Communications Market

The Federal Communications Commission ("FCC")[1] defines VoIP as follows:

> "Voice over Internet Protocol (VOIP) is a technology for communicating using 'Internet protocol' instead of traditional analog systems. *** VoIP converts the voice signal from your telephone into a digital signal that can travel over the Internet. If you are calling a regular telephone number, the signal is then converted back at the other end. Depending on the type of VoIP service, you can make a VoIP call from a computer, a special VoIP phone, or a traditional phone with or without an adapter. In addition, new wireless "hot spots" in public locations such as airports, parks, and cafes allow you to connect to the Internet, and may enable you to use VoIP service wirelessly."

---

[1]   FCC Consumer Facts, Voice Over Internet Protocol (VoIP), issued 9/21/09, online publication at http://www.fcc.gov/cgb/consumerfacts/voip.pdf (herein "FCC VoIP Brochure").

On June 25, 2010, the FCC released its Local Telephone Competition Report,[2] that reported, based on data current as of December 31, 2008, there were 21 million interconnected VoIP subscriptions in the United States, out of a total of 162 million total connections.  The FCC Report also found that "VoIP service represents an important and rapidly growing part of the U.S. voice market."  (Carreon Dec. ¶ 2, Exhibit 13.)

## B.   Plaintiff's Unique iCall® VoIP Product

Plaintiff's VoIP calling platform uses computer programs that were developed exclusively in-house by Plaintiff's programmers.  (Gilbert Dec. ¶ 3.)  The program has been submitted for registration with the United States Copyright Office, and its patent application is pending with the United States Patent and Trademark Office ("USPTO").  (Gilbert Dec. ¶ 3; Exhibit 1.)  The iCall® software operates on desktop computers and on the Apple iPhone and iPod.  (Gilbert Dec. ¶ 4.)  iCall, Inc. offers the iCall® Service in both free and paid versions, and offers wholesale VoIP solutions through iCall®Carrier Services.  (Gilbert Dec. ¶ 4.)

Plaintiff's most popular version of the software is sold through the Apple iPhone "App Store," and runs on the iPhone and the iPod music player.  (Gilbert Dec. ¶ 5.)  Over half of all downloads of the iCall® software are made through the Apple App Store.  (Gilbert Dec. ¶ 5.) Plaintiff's iCall® software has been at the forefront of iPhone VoIP, becoming the first company to move into the market when AT&T and Apple agreed to allow VoIP providers with approved Apps to access the AT&T wireless data network.  (Gilbert Dec. ¶ 6.)  The iCall® software was the first to enable conversion of a media player, the iPod Touch, into a portable phone, and the first to allow users of the iPhone and iPod platform to make long-distance telephone calls at no cost.  (Gilbert Dec. ¶¶ 6-7.)  This is made possible by the wireless antenna in the iPod Touch, that was included so that users could download music from the iTunes store, and later became the conduit for downloading compatible computer programs from the App Store.  (Gilbert Dec. ¶ 8.)  Thus, anytime an iPod user with the iCall® software is in one of the innumerable "WiFi hot-

---

[2]   Attached as Exhibit 13 to the Declaration of Charles Carreon is the official FCC Press Release providing the summary data.   The full, quite voluminous report is available at http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-299051A1.pdf.

spots" that are found in homes, offices, and coffee-shops, they can make a long-distance VoIP call for free.  iCall® VoIP is truly a unique product that puts amazingly powerful, virtually free, one-of-a-kind communications capabilities in the hands of people who may not even have telephones. By producing a string of technical "firsts," Plaintiff has garnered outsized publicity for its iCall® VoIP product, making its mark a magnet for Internet traffic.  (Gilbert Dec. ¶ 9.) As the statistics cited *infra* demonstrate, VoIP generally, and particularly VoIP delivered through wirelessly to the iPhone and iPod Touch, are of dominant commercial importance in the California computer-products marketplace.

### C.    The California Wireless VoIP Market

California is the pre-eminent WiFi hot-spot Mecca in the United States, consuming 18% of the nation's Wi-Fi bandwidth, with four cities among the top twenty WiFi markets: Los Angeles (9.6%), San Francisco (3.9%), San Diego (1.5%), and Sacramento (1.0%).  (Gilbert Dec. ¶ 10; Exhibit 2, "AdMob Metrics Report," January 2009.)  The largest number of requests for wireless service also come from the two Apple devices that run iCall® VoIP software: the iPhone (16.8%) and iPod Touch (12.3%). (Gilbert Dec. ¶ 10; Exhibit 2.)  Over half of all downloads of the iCall® software are made through the Apple App Store.  (Gilbert Dec. ¶ 11.) Thus, the epicenter of Plaintiff's market is California.  (Gilbert Dec. ¶ 11.)

California also has the largest concentration of VoIP usage in general, according to the FCC VoIP Report, that shows that its citizens are far and away the largest consumers of VoIP services of every type, both in business and residential usage.  (Carreon Dec. ¶ 3; FCC Report, Table 9, Exhibit 13.)

### D.    Plaintiff Offers iCall® VoIP Services Using Its Suggestive, Registered, Incontestable, iCall® Trademark Through the iCall.Com Website

#### i.    The iCall® Mark Has Been Registered Since October 6, 1998

Plaintiff owns the incontestable federal trademark on the iCall® mark, Registration No. 2,194,066, registered on October 6, 1998 in connection with telephone communications services, including aural and optical information transmission.  (Gilbert Dec. ¶¶ 12 - 13; Exhibits 3, 4 and 5.)  Complainant's predecessor in interest first used the iCall® mark in commerce in connection

with the recited services in November 1997, and Complainant took over the provision of services thereunder in March 2004.[3]  (Gilbert Dec. ¶ 14.)

The United States Patent and Trademark Office has rejected the registration of marks that would give rise to a likelihood of confusion with the iCall® mark.  On May 20, 1999, Telia, a Swedish telecommunications company holding the registered mark "Telia," attempted to register "TELIA ICALL" (Serial No. 75/716332).  Finding the proposed registration to conflict with the prior registration of iCall®, the Examining Attorney refused registration of the TELIA ICALL cojoined mark because "customers are likely to believe that the applicant's goods and services emanate from the same source as registrant's [iCall, Inc.'s] goods."  (Carreon Declaration, ¶ 4; Exhibit 14, is a true copy of the USPTO Office Action, of which judicial notice is requested pursuant to F.R.E. 201(b)(2) and (d)).

### ii.    The iCall® Mark Is Suggestive

Marks are classified by the USPTO in descending order of strength as arbitrary, suggestive, descriptive, and generic.  Generic marks are not registrable, and descriptive marks are registrable with proof that they have acquired secondary meaning.  The USPTO Trademark Manual of Examination Procedures ("TMEP") states:

> With regard to trademark significance, matter may be categorized along a continuum, ranging from marks that are highly distinctive to matter that is a generic name for the goods or services. The degree of distinctiveness – or, on the other hand, descriptiveness – of a designation can be determined only by considering it in relation to the specific goods or services. At one extreme are marks that, when used in relation to the goods or services, are completely arbitrary or fanciful. Next on the continuum are suggestive marks, followed by merely descriptive matter. Finally, generic terms for the goods or services are at the opposite end of the continuum from arbitrary or fanciful marks.  Fanciful, arbitrary and suggestive marks, often referred to as "inherently distinctive" marks, are registrable on the Principal Register without proof of acquired distinctiveness. See TMEP §1209.01(a).  Marks that are merely descriptive of the goods or services may not be registered on the Principal Register absent a showing of acquired distinctiveness under 15 U.S.C. §1052(f). See TMEP §1209.01(b) regarding merely descriptive marks, and TMEP §§1212 et seq. regarding acquired distinctiveness.

---

[3]   Plaintiff's predecessor in interest offered telephone communication services via the Internet, and Plaintiff continues the same line of business; thus, the assignment is effective to transfer priority of use.  "[A]ny assignment … requires the mark itself be used by the assignee on a product having substantially the same characteristics."  *Pepsico, Inc. v. The Grapette Company, Inc.,* 416 F.2d 285 (8th Cir. 1969); *accord, Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 (7th Cir. 1982), *citing Hy-Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (C.C.P.A., 1962).

TMEP §1209.1, Distinctiveness/Descriptiveness Continuum (case citations omitted).

It is clear from the registration record available at USPTO.Gov that the mark was not considered "descriptive," because there was no proof of acquired distinctiveness submitted by the applicant, and no Office Action issued requiring such proof, which as noted above in TMEP §1209.1, would have been required under TMEP §1052(f).  (Carreon Dec. ¶ 5.)  The only Office Action issued by the USPTO Examining Attorney pertaining to the nature of the mark itself was the requirement that the applicant include the typographical specification: "The mark consists of the word 'iCall' in upper and lowercase."  (Carreon Dec. ¶ 5; Exhibit 15.)

Plaintiff's iCall® mark is properly characterized as suggestive, because it requires "imagination, thought or perception" to determine the nature of the goods and services offered by Plaintiff.  The TMEP states in relevant part:

> "Suggestive marks are those that, when applied to the goods or services at issue, require imagination, thought or perception to reach a conclusion as to the nature of those goods or services.  Thus, a suggestive term differs from a descriptive term, which immediately tells something about the goods or services.  *See In re Shutts*, 217 USPQ 363 (TTAB 1983) (SNO-RAKE held not merely descriptive of a snow removal hand tool) [further citations omitted].  Suggestive marks, like fanciful and arbitrary marks, are registrable on the Principal Register without proof of secondary meaning.  ***Therefore, a designation does not have to be devoid of all meaning in relation to the goods and services to be registrable.***

TMEP §1209.01(a), Fanciful, Arbitrary and Suggestive Marks (emphasis added).

### iii.    The iCall® Mark Is Incontestable

Complainant has assiduously maintained its ownership rights in the iCall® Mark, utilizing the services of legal counsel both to comply with the legal requirements to maintain the viability of the iCall® Mark on the Principal Register of the USPTO, and to prevent infringing uses of the trademark by other businesses. (Gilbert Dec. ¶ 13.)  On October 3, 2008, iCall submitted its "Combined Declaration of Use in Commerce & Application for Renewal of Registration of a Mark under Sections 8 & 9." (Gilbert Dec. ¶ 13; Exhibit 4.)  On October 11, 2008, the USPTO renewed iCall's ownership of the iCall® Mark.  (Gilbert Dec. ¶ 13; Exhibit 6.)  On December 16, 2009, Complainant submitted its "Declaration of Incontestability of a Mark under Section 15" with the USPTO.  (Gilbert Dec. ¶ 13; Exhibit 5.)  On January 26, 2010, the

USPTO issued its Notice of Acknowledgment of §15 Declaration, thus establishing the mark's incontestability.  (Gilbert Dec. ¶ 13; Exhibit 6.)

### E.  **Plaintiff Offers iCall® VoIP Through the iCall.Com Website**

Plaintiff's CEO acquired the iCall.Com domain, that was first registered on November 26, 1996, in a single transaction along with the purchase of the iCall® Mark and its goodwill.  (Gilbert Dec. ¶ 14.)  Mr. Gilbert maintained and developed the iCall.Com website as the primary marketing and sales location for iCall® products and services, and assigned his interest in the mark, goodwill and domain name to iCall, Inc.  (Gilbert Dec. ¶ 4; Exhibit 7.)

### F.  **"Project Reliance iCall" -- Designed and Deployed in India, Directed at the U.S. Market by Reliance Limited and the Other Reliance Defendants**

All four named defendants have participated in concrete, identifiable ways in committing infringements upon Plaintiff's iCall® mark, and are sometimes referred to herein as the "Reliance Defendants."  All four named defendants are corporate relatives ruled over by a single, pre-eminent individual, Anil Dhirubai Ambani, Chairman of the Board of Reliance Anil Dhirubai Ambani Group (herein "Mr. Ambani," and "Reliance-ADAG").  (Carreon Dec. ¶ 6.) The Reliance-ADA Group website describes defendant Reliance Communications Limited ("Reliance Limited") as "the flagship company of the Reliance-ADA Group."  (Carreon Dec. ¶ 6; Exhibit 16.)  Mr. Ambani, who acquired a large stake in Steven Spielberg's Dreamworks in 2008,[4] was quoted as saying "As a company Reliance always looks for new frontiers of doing the unthinkable…."  (Carreon Dec. ¶ 6; Exhibit 17.)

The development and exploitation of Reliance iCall is a joint corporate project that involves employees from multiple Reliance entities.  (Carreon Dec. ¶ 7.)  A key person in that inter-company effort is Siddhangana Karmakar, based in the "Mumbai Area, India," who describes her job experience from June 2008 to the present date as "Product Marketing Manger

---

[4]   The BBC World News reported, on October 6, 2008:  "Reliance ADA Group, run by Anil Ambani - the sixth richest man in the world - is already a big player in Bollywood, India's film business. Now the new studio will make movies in the US, putting large amounts of Indian money into America's film industry. The deal was first reported last month but has only just been confirmed. It is a story of Hollywood meets Bollywood in a $1.5bn (£0.85bn) deal."  Readable online at http://news.bbc.co.uk/2/hi/7653972.stm.

at Reliance Communications (Global) at Reliance ADAG" on the LinkedIn.com website. (Exhibit 18, Carreon Dec. ¶ 7.)  Ms. Karmakar "studied the competition," "conducted market research, identified target group & positioned service in the US market." For two years she has been wholly focused on developing and marketing the Reliance iCall "VoIP (Internet-telephony) service." (Exhibit 18; Carreon Dec. ¶ 7.)  Her work included creating "the branding & marketing plan of Reliance iCall," launching "the e-commerce website for the service," "targeting NRIs[5] in US," and conducting "viral email campaigns which lead up to 135% growth in revenue within a period of 1 month."[6]  (Exhibit 18; Carreon Dec. ¶ 7.)

Another employee, Richard Foss, also based in the Mumbai Area, currently a Business Analyst at Reliance Limited and Reliance Infocomm, was previously a Business for Reliance iCall, that he described as a "VoIP product offered by Reliance Globalcomm voice business." (Exhibit 19; Carreon Dec. ¶ 9.)  Another unnamed former employee listing his experience at LinkedIn.Com, based in the "New Delhi Area, India," describes himself as a "tester" at Reliance Limited from January 2009-May 2009, working on "Project Reliance iCall (IP Telephony)." (Exhibit 20; Carreon Dec. ¶ 8.)

The resumes of Ms. Karmakar, Mr. Foss, and the unnamed "tester" for "Project Reliance iCall" make it very clear that the design, development and profitable operation of RelianceiCall.com has been engineered in India for specific implementation in the United States, particularly in California, where the largest concentrations of "Non-Resident Indians" are found in this country.  (See *infra*, and Carreon Dec. ¶ 12; Exh. 23.)

### i.    The Reliance Defendants' Use of The Inherently-Confusing "Reliance iCall" Cojoined Mark and Infringement of the iCall® Mark on the RelianceiCall.com Website

Reliance Limited registered RelianceiCall.com on August 11, 2008, as is recorded in Exhibit "8," a true and correct copy of the WHOIS database information regarding the

---

5    "NRI" is an acronym for "Non-Resident Indians."   As noted *infra*, Minesh Patel, the Assistant Vice President – Legal of Reliance Limited has confirmed under oath that this is the "target market" of the RelianceiCall.com website marketing.

6    By directing email traffic to the RelianceiCall.com website, Ms. Karmakar utilized the iCall® mark in ways that were clearly profitable to Defendants, although invisible to Plaintiff.

registration of Reliance iCall.com. (Gilbert Dec. ¶ 15; Exhibit 8.)    With the exception of a legally-insignificant descriptive prefix, this domain is identical to the iCall.Com domain name. Reliance Limited, and its co-defendant subsidiaries, are using the RelianceiCall.com domain to offer both free and fee-generating VoIP and long-distance telephone calling services that to the consumer, are essentially identical, and in direct competition with the services offered by Plaintiff. (Gilbert Dec. ¶¶ 14 - 15; Exhibit 7; Exhibit 9.)

         **ii.**     **Reliance Communications Limited – Indian Corporate Parent and RelianceiCall.com Domain Name Owner, Is Infringing the iCall® Mark In California Commerce**

Reliance Limited is an Indian corporation traded on U.S. exchanges under the stock ticker RCOM.    (Carreon Dec. ¶ 9; Exhibit 21.)    Reliance Limited is India's largest telecommunications company, with a market capitalization of $ 8.4 Billion U.S.,[7] and it is the sole registrant of the RelianceCall.com domain name.  (Carreon Dec. ¶ 9; Exhibit 21.)

Reliance Limited has claimed full operational control over the RelianceiCall.com website, the primary source of infringement against the iCall® mark complained of in this action.  Reliance Limited has admitted full operational control over the RelianceiCall.com website, stating that it used it to market to the "target Indian-expatriate consumer market."  The Assistant Vice President – Legal of Reliance Limited stated, referring to Reliance Limited as "Reliance" in a declaration submitted under oath:[8]

> Reliance is such a large and successful global telecommunications company that it gained 11.3 million subscribers during the first quarter of 2009 in India alone and its total subscribers in India alone stand at 100 million by March 2010.

(Carreon Dec. ¶ 11; Exhibit 22, Declaration of Minesh Patel, ¶ 4.)

> Reliance has offered its telecommunications services under a variety of brand Names [including] Reliance iCall for Internet-based calling services.

(Carreon Dec. ¶ 11; Exhibit 22, Declaration of Minesh Patel, ¶ 5.)

---

[7]    Per Exhibit 21, the market capitalization was 394,435 Billion Indian Rupees (INR), and on July 2, 2010, the exchange rate was one U.S. dollar per 46.56 INR.

[8]    Like the declaration of Michael Sauer quoted hereinbelow, Mr. Patel's declaration was submitted by Reliance Limited in opposition to a UDRP proceeding initiated by Plaintiff.  *See* section II.G, *infra*.

Reliance's RELIANCE ICALL mark … begins with the famous mark RELIANCE followed by the descriptive word "iCall": the letter "i" preceding a word is now widely understood to signify that the Internet is involved and the word following the "i", in this case "Call", informs consumers that this is a calling service. Taken together, the mark RELIANCE ICALL is easily understood **by the target Indian-expatriate consumer market** to mean an Internet-based calling service that is provided by a Reliance group company. Reliance has marketed its Reliance iCall services only to inactive customers of its Reliance GlobalCall services to urge them to use Reliance's Internet based service to place international calls.

(Exhibit 22 to Carreon Dec., Declaration of Minesh Patel, ¶ 6, emphasis added.)

By declaring that the purpose behind its website is to market to the Indian-expatriate consumer market, Reliance Limited has admitted targeting the RelianceiCall.com website to a large, distinct set of California consumers.  The Los Angeles Times reported in 2003 that there were 400,000 Indian expatriates in California, quoting a leader of the California Indian expat community as follows:  "'*California is where the growth of the [Indian] economy is coming from … That's where the bulk of the capital is coming from.*'"  (Carreon Dec. ¶ 12; Exhibit 23.)

### iii.   Reliance Communications International, Inc., Reliance Limited California-registered Subsidiary, Is Infringing the iCall® Mark

Reliance Communications International, Inc. ("Reliance International") is a Delaware company registered to do business in California as Entity No. C2645415.  (Carreon Dec. ¶ 13.) Previously, Reliance International offered Reliance's long-distance and VoIP services via "click-wrap" contracts that were utilized on the RelianceiCall.com website.  (Carreon Dec. ¶ 13.)  Its Executive Vice President Michael Sauer averred in a declaration under oath that Reliance International was marketing to the Indian expat community, referring to Reliance International as "RCII" in the following statement:

"RCII is a U.S.-based indirect subsidiary of [Reliance Limited] that offers retail international telecommunications services **primarily to the Indian-American community in the United States**. RCII currently has over a million US customers for its Reliance Globalcall services."

(Carreon Dec. ¶ 13; Exhibit 24, Declaration of Michael Sauer, ¶ 2, emphasis added.)

By admitting that Reliance International has over a million US customers for its services, the majority of whom he implies are from the "Indian-American community," Mr. Sauer has admitted that Reliance International has directed its marketing efforts at a cognizable group of

California residents, and has converted a very substantial, as yet undetermined number of them, into Reliance International customers.

**iv.    Reliance Globalcom Services, Inc. -- California-Based Subsidiary, Co-Infringer of the iCall® Mark, and Corporate Agent of All Defendants**

The website for Reliance Globalcom Services, Inc. is Yipes.Com.  On the first page of the Yipes.Com website, there is a hyperlink for "Reliance iCall" that leads the Internet user directly to RelianceiCall.com.  Yipes, an early California Internet startup founded in 1999, has been a part of the Reliance-ADA Group since it was acquired by Reliance Limited on July 16, 2007.  In a Reliance-ADA Group press release of that same date, Mr. Ambani announced:

> "We see enormous potential to rapidly expand Yipes' coverage in the U.S. and to globalize Yipes service by leveraging our customer relationships and network reach around the globe. We confidently expect this acquisition to significantly enhance the growth rate, profitability and returns of our global data business."

(Carreon Dec. ¶ 14; Exhibit 26.)

In the same press release, Punit Garg, the "President, Global Business, Reliance Communications," was quoted as saying:

> "We plan to leverage the significant headstart of Yipes in Ethernet services, double the coverage in the U.S. domestic market, and rollout Yipes services over the FLAG Global Network. We are fully committed to bringing Ethernet services to nearly 40 new countries."

**v.    Reliance Communications (U.K.), Ltd. -- U.K.-Based Subsidiary Infringing the iCall® Mark in California Commerce**

Reliance Communications (U.K.), Ltd. ("Reliance UK") is the entity that currently enters into "click-wrap" contracts with Internet users who sign up to obtain "Reliance iCall Service" at the RelianceiCall.com website.  (Gilbert Dec. ¶ 16; Exhibit 9, pages 2 - 8.)   The website is accessible in California, and according to the Declarations of Minesh Patel and Michael Sauer, who by occupation and past declaration are the authorized agents of Reliance Limited, is marketed to the Indian expatriate community that preponderantly resides in the State of California.

### G.   Plaintiff's Prompt Efforts To Halt the Infringement Via UDRP

Promptly after discovering the infringement occurring on and through the RelianceiCall.com website, Plaintiff commenced a proceeding under the Uniform Dispute Resolution Procedure[9] provided for by ICANN, requesting transfer of the infringing domain to Plaintiff.  (Carreon Dec. ¶ 16.)  The arbitration panel appointed by the National Arbitration Forum ("NAF") denied transfer of the infringing domain in a brief decision that perfunctorily disposed of matter with the puzzling conclusion that RelianceiCall.com "is not confusingly similar to a trademark or service mark in which Complaint [sic] has rights."  (Carreon Dec. ¶ 16.) Twenty-two days later, on May 21, 2010, Plaintiff filed this action to obtain relief against all Reliance Defendants.  (Carreon Dec. ¶ 16.)

## III.   ARGUMENT

### A.   The Preliminary Injunction Standard

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sanlin*, 846 F.2d 1175, 1180  (9th Cir. 1988).  To prevail on a motion for a preliminary injunction under F.R.Civ.P. 65, Plaintiff:

> "[M]ust establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent a preliminary injunction, (3) that the balance of equities tips in favor of issuing an injunction and (4) that an injunction is in the public interest."
>
> *Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d 1024, 1031 (NDCAL 2009), *citing Winter v. Natural Resources Defense Council,* ___U.S. ___, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

The elements of infringement of a registered mark are: (a) use of a reproduction, counterfeit, copy or colorable imitation of the mark, (b) in commerce , (c) without the mark-owner's consent, (d) in connection with the sale, offering for sale, distribution or advertising of any goods, (e) where such use is likely to cause confusion, mistake or deception. 15 U.S.C. §

---

[9]   An action brought under the cybersquatting provisions of the Lanham Act "on the heels of [a UDRP] proceeding ... is independent of, and involves neither appellate-like review of nor deference to, the underlying proceeding." *Sallen v. Corinthians Licenciamentos Ltda*, 273 F.3d 14, 18 (3rd Cir. 2001).  "UDRP proceedings were never meant to replace formal litigation." *Dluhos v. Strasberg,* 321 F.3d 365 (3rd Cir. 2003).

1114(1)(a); *Century 21,* 846 F.2d at 1178.  A plaintiff establishes a likelihood of prevailing on the merits of a trademark infringement action by establishing its ownership of a protectable mark, and that the defendant's use of the mark creates a likelihood of consumer confusion.  *See, Maxim, supra* at 1031, *citing Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir. 1985)(*en banc*) and *Abercrombie & Fitch Co. v. Moose Creek, Inc.,* 486 F.3d 629, 633 (9th Cir.2007)("core element of trademark infringement is … whether the similarity of the marks is likely to confuse customers about the source of the products").

In *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1204-05 (9th Cir.2000), the Ninth Circuit applied the eight-part analysis set forth in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir.1979) to the infringement of plaintiff's trademark by the use of a confusingly-similar Internet website domain name and logo.[10]  In *Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d 1024 (N.D.Cal. 2009), a recent decision factually analogous to the case at bar, this Court analyzed the facts under all eight *Skillcraft* factors, providing a template for proper anlaysis of this case.

## B.  The "Internet Trinity"

> "In the internet context, 'the three most important *Sleekcraft* factors in evaluating a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods and services, and (3) the parties' simultaneous use of the Web as a marketing channel.'  When this controlling troika or internet trinity suggests confusion is likely, the other factors must weigh strongly against a likelihood of confusion to avoid the finding of infringement."

*Perfumebay v. eBay*, 506 F.3d 1165, 1173, quoting *Interstellar Starship Services v. Epix, Inc.,* 304 F.3d 936, 942 (9th Cir. 2002).

### i.  Application of the Internet Trinity in *Maxim Integrated Products*

In *Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d 1024 (N.D.Cal. 2009), the Court granted a preliminary injunction to the owner of the incontestable, Federally-registered

---

[10]  In *Winter, supra,* the Supreme Court corrected that portion of the *GoTo.com* opinion holding that upon making a showing of likelihood of confusion, a trademark plaintiff was entitled to a presumption of irreparable harm; however, its application of the *Sleekcraft* factors to Internet cases remains fully viable.  *Eg., Maxim,* 654 F.Supp.2d at 1031.

"iButton" mark, enjoining defendant from utilizing "My-iButton."  This Court noted the primacy of the "Internet trinity" factors, and analyzed them first.  *Maxim* 654 F.Supp.2d at 1031, *citing Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1055 n. 16 (9th Cir.1999).

   ***The first factor was determined in the Maxim plaintiff's favor*** because "'My-iButton' incorporates 'I Button' in its entirety," and in another marketing context, where the defendant referred to his product as "the i-button," the marks were "undistinguishable."  *Maxim,* 654 F.Supp.2d at 1033, *citing Perfumebay.com, Inc. v. eBay, Inc.,* 506 F.3d 1165, 1174 (9th Cir. 2007)(cojoined "perfumebay" mark infringed eBay mark).  ***The second factor was determined in plaintiff's favor,*** because its product was a "computer chip enclosed in a 16mm-thick stainless steel can," registered in International Class 09 for portable computer electronic devices,  and defendant's product was "a portable MP4 promotional device that … displays videos or pictures;" therefore, "the relatedness of the products in the field of small portable electronics weighs in favor or Plaintiff."[11]  *Maxim,* 654 F.Supp.2d at *id.*  ***The third factor was determined in plaintiff's favor*** because "Plaintiff's evidence shows that Plaintiff and Defendants use the Internet as a significant marketing channel for their products…[t]hus, this factor weighs in favor of Plaintiff."  *Maxim,* 654 F.Supp.2d at *id.*

   **ii.    The Internet Trinity Factors Weigh In Plaintiff's Favor**

   **1.    Similarity of The Marks**

   The first Internet Trinity factor weighs in favor of iCall because the iCall and Reliance iCall marks share controlling similarities.  Like the *Maxim* defendant, Reliance incorporated the entire iCall® mark into its own cojoined "Reliance iCall" mark.  In *Perfumebay v. eBay, supra,* the Ninth Circuit found a likelihood of confusion between the marks "Perfumebay" and "eBay" because "'Perfumebay' incorporates the eBay trademark in its entirety."  *PerfumeBay v. eBay,*

---

[11]   Defendant's efforts to obtain a trademark on My-iButton in International Class 26 pertaining to "fancy goods" weighed against defendants.   International Class 26 covers "lace and embroidery, ribbons and braid; buttons, hooks and eyes, pins and needles; [and] artificial flowers," from which the Court inferred that defendant had "intentionally avoided applying for a trademark that would be compared with Plaintiff's products."  Similarly, in this case, Defendants have registered the "Reliance" mark but have not attempted to register "Reliance iCall."

506 F.3d at 1174.  In *Maxim,* this Court applied the *PerfumeBay* precedent to another case where a registered mark was incorporated wholesale into an infringing mark, finding that "iButton" and "My-iButton" are "strikingly similar."  *Maxim,* at 1031.  As this Court noted, "similarities weigh more heavily than differences."  *Maxim at id., citing Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1144 (9th Cir.2002).  Similarly here, when Defendants' incorporation of the entire iCall® mark within the Reliance iCall mark is given greater weight, similarity clearly preponderates, and there is a very high likelihood of confusing the two.

In *PerfumeBay v. eBay*, the Ninth Circuit also noted that similar typography will strengthen the overall similarity of the marks.  Thus, it is significant that the *PerfumeBay* defendant "utilizes the spelling as 'Perfumebay,'" and while purporting to "utilize the separate terms 'Perfume' and 'Bay' at the top [of the webpage] … ***the domain name itself is 'perfumebay.com,' once again incorporating eBay's mark***."  *PerfumeBay v. eBay,* 506 F.3d  at 1174 (emphasis added).  Similarly, although Reliance separates the terms "Reliance" and "iCall" on the webpage, it has strengthed the visual similarity by copying Plaintiff's typography (the small "i" and upper-case "C").  (Gilbert Dec. ¶ 18, Exhibit 9.)  And like the *PerfumeBay* defendant, the Reliance Defendants' RelianceiCall.com domain totally incorporates Plaintiff's mark.  Thus, with respect to "sight," the similarity between the marks is overwhelming.

With respect to "sound," when spoken as part of "Reliance iCall," the word "iCall" is phonetically unchanged.  Finally, with respect to "meaning," since "iCall" is merely suggestive, adding "Reliance" to this suggestive term does not alter its meaning, but rather sows confusion and invites mistake as to the origin of "iCall."

In *PerfumeBay, supra*, the Ninth Circuit also found that "similarity is demonstrated in the search engine results, resulting in 'eBay' and 'perfumebay' links."  In this case, Plaintiff has demonstrated that the "iCall" phrase is found in the machine-readable metatags on the RelianceiCall.com website.  (Gilbert Dec. ¶ 15, Exh. 9).  Additionally, the search engine results show that RelianceiCall.com obtains the majority of its search engine traffic from "hits" generated by searches for Plaintiff's iCall mark.  (Gilbert Dec. ¶ 16, Exhibit 16, pages 9 – 14.)

Although *Maxim* and *PerfumeBay* both involve website infringement, the principle they apply is well-known to trademark law.  Whenever a junior user has attempted to annex a senior user's mark by blending the senior user's mark with its own, the judiciary has responded in the same common-sense fashion – by condemning the practice.  This has been the holding where, as in the herein case, the junior user has annexed the senior user's mark to its own, registered mark.  In *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006), the plaintiff was a retailer of kitchen appliances with a common law trademark in the word "Attrezzi."  The defendant was a much larger competitor -- Maytag, the famous appliance company.  Just as in this case, Respondent joined its "Jenn-Air" mark to Complainant's Attrezzi mark, and began to market kitchen appliances under the "Jenn-Air Attrezzi" mark.  *Attrezzi,* 436 F.3d at 38-40.  After a trial verdict in favor of Attrezzi, LLC, the Second Circuit held that the jury's verdict was supported by the law and the evidence.

In the Ninth Circuit, the result was the same where a junior user joined a fanciful mark with a senior user's mark to create a cojoined mark for its personal computers – the "Pineapple."  *See, Apple v. Formula Int.,* 752 F.2d 521, 526 (9th Cir. 1984)(upholding injunction because "the addition of the prefix 'Pine' to the trademark 'Apple' presented a likelihood of confusion."  *Id.,* 752 F.2d at 526.

In the First Circuit, the result was the same when a junior user joined a descriptive term with a senior user's mark.  *See Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 481, 31 U.S.P.A.2d 1592 (3rd Cir. 1994)(case reversed and remanded where District Court refused to enjoin defendant's use of "Fairway Green" to market fertilizer where plaintiff was senior user of "Fairway" for marketing peat moss).[12]

---

[12]  *Fisons* also contains an unusual partial dissent that essentially argues that when a senior user's mark is fully incorporated into the infringing mark, it is confusingly similar as a matter of law: "While I am in wholehearted agreement with the majority that we must reverse the district court's ruling on the merits, I can see no purpose in remanding for retrial of Fisons' Lanham Act claims when it is so evident that the marks at issue here are confusingly similar. *** Accordingly, I would reverse the district court's order and remand with the direction that the district court enter judgment for Fisons on its Lanham Act claims."  30 F.3d at 482.

### 2.      Relatedness of the Goods

The second of the Internet Trinity factors weighs in favor of iCall.  In weighing this factor, the *Maxim* decision notes that "a court must focus on consumers and ask whether they are likely to associate two products."   *Maxim, supra* at 1032.   Both iCall and Reliance offer computer and wireless device users free and paid long-distance telephone service using VoIP. (Exhibits 7 and 9.)  From the standpoint of the consumer, Plaintiff and Reliance offer essentially identical products and services.  (Gilbert Dec. ¶ 15.)

### 3.      Marketing Channels Used

The third Internet Trinity factor weighs in favor of iCall.  Both Plaintiff and Reliance utilize the Internet as the primary marketing channel for VoIP services.   "The Web, as a marketing channel, is particularly susceptible to a likelihood of confusion, since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen." *Perfumebay, supra,* 506 F.3d at 1175, *quoting Goto.com,* 202 F.3d at 1207.  Internet users have little incentive to draw distinctions between two offerings of what appear to be the identical service, and thus, "the question in this analysis is … how high the cost is of choosing one service – that is, one web site – over another…."  *Goto.com,* 202 F.3d at 1209.  Because "entering a web site takes little effort – usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership."  *Goto.com,* 202 F.3d at 1209, *quoting Brookfield,* 174 F.3d at 1057.

### C.      <u>The Remaining Five Sleekcraft Factors</u>

When "the three primary factors for internet trademarks weigh against" the non-moving party, "the remaining *Sleekcraft* factors… 'must weigh strongly against a likelihood of confusion to avoid the finding of infringement.'"   *Perfumebay v. eBay, supra,* 506 F.3d at 1175, *quoting Interstellar Starship Services v. Epix, Inc.,* 304 F.3d at 942.

### i.      Strength of the Mark

In *Goto.com,* the Ninth Circuit observed the diminished importance of this factor when the conflicting marks and the competing services are "almost identical," as is the case here:

> "We do not believe this factor to be of much importance in either the context of the Internet generally or in this case specifically, regardless of whether either logo had herculean strength.  In *Brookfield*, we noted that in situations in which the appearance of the conflicting marks and the services provided are almost identical, 'the strength of the [senior user's] mark is of diminished importance in the likelihood of confusion analysis.'  We underline that conclusion here."

*Goto.com, Inc.,*  202 F.3d at 1208, *quoting Brookfield,* 174 F.3d at 1059.

However, Plaintiff's mark fares well when subjected to an analysis of its strength in the same manner as this Court analyzed the mark at issue in *Maxim*.  The iCall® mark is a suggestive mark, of inherently "moderate" strength, that has been "strengthened by such factors as extensive advertising, length of exclusive use, [and] public recognition."  *See Maxim,* at 1033.  Like the iButton mark in *Maxim,* iCall has had exclusive use of the mark for an extended period of time – fourteen years.  *Maxim, at id.* (iButton mark in use "nearly ten years").  And as in *Maxim,* Plaintiff here has invested approximately $2,000,000 in developing the iCall technology and marketing its VoIP products, resulting in the over 5 Million downloads.  (Gilbert Dec. ¶ 20.)  *See Maxim, at id.* (investment of $2 Million and more than a million iButton products currently in use warranted finding that "strength of iButton mark weighs in favor of Plaintiff").  Accordingly, this factor weighs in Plaintiff's favor.

### ii.    Defendants' Intent in Selecting Mark

**"**Where a defendant knowingly adopts a mark similar to another's, the court may presume an intent to deceive consumers. " *Maxim,* 654 F.Supp.2d at 1033, *citing Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir.1993).  Such a presumption is warranted here, where, according to the LinkedIn.com resume of Ms. Karmakar, "studied the competition" to develop the RelianceiCall.com website, content, and marketing approach.  (Exhibit 18.)  Additionally, even though Reliance Limited "obtained 655 RELIANCE trademarks in India and abroad" from 1998 through 2010, during which time it registered "RELIANCE" and "RELIANCE INDIACALL" with the USPTO (Declaration of Minesh Patel, ¶ 9; Exhibit 22 to Carreon Dec.), it has studiously avoided attempting to register "RELIANCE ICALL."  No doubt its trademark counsel advised against such an effort, that would almost certainly be rebuffed by the Exmaining Attorney, as Telia was rebuffed when it attempted to register TELIA ICALL.  (Carreon Dec. ¶ 4; Exhibit 14.)  Accordingly, the factor of the infringing party's intent weighs in Plaintiff's favor.

### iii.    Likelihood of Expansion in Other Markets

As this Court observed in *Maxim,* citing Ninth Circuit authority, this *Sleekcraft* factor is essentially of no relevance where the conflicting marks are already being used in the same market for nearly identical goods.  *Maxim,* 654 F.Supp.2d at 1034.

### iv.    Degree of Care Likely to Be Exercised by Consumers

This *Sleekcraft* factor is essentially subsumed into the second factor of the Internet Trinity, because as the *Goto.com* and *Brookfield* opinions makes clear virtually as a matter of law, Internet consumers choosing between competing Web-offerings are likely to exercise little effort in distinguishing between the products offered on two different websites.  *Goto.com,* 202 F.3d at 1209, *quoting Brookfield,* 174 F.3d at 1057.   Because Plaintiff and the Reliance Defendants are offering virtually indistinguishable products through the same Internet market channel, this factor weighs in Plaintiff's favor.

### v.    Evidence of Actual Confusion

Although evidence of actual confusion is not required to justify granting a preliminary injunction so long as there is a showing of likelihood of confusion, there is evidence of actual confusion in this case.  The RelianceiCall.com website currently derives a majority of its search engine traffic from Internet visitors who are searching for the term "iCall."  (Gilbert Dec. ¶ 17; Exhibit 11.)

### D.    The Likelihood of Irreparable Harm

"A plaintiff seeking a preliminary injunction must demonstrate more than a likelihood of success on the merits of its claims. A plaintiff must also demonstrate a likelihood that absent the injunction, it will be irreparably harmed by defendant's alleged infringing conduct.   In trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill.  Irreparable injury exists where a court reasonably concludes that continuing infringement will result in loss of control over the plaintiff's reputation and good will."

*Maxim,* 654 F.Supp.2d at 1035 – 1036 (multiple citations omitted).

In *Maxim*, this Court found evidence "that Defendants' My-iButton has been consistently referred to as the 'iButton,' including in a negative product review of the My-iButton" established that the plaintiff "ha[d] already lost some control over its business reputation and

goodwill." *Maxim*, 654 F.Supp.2d at 1036.  Combined with a "lack of evidence with regard to whether [defendants'] manufacture and use of My-iButton products will continue in the future," this Court found that plaintiff shown that "irreparable harm is likely absent a preliminary injunction."

In this case, there is evidence that Plaintiff's VoIP products and services are being confused with those of the Reliance defendants, and in some cases, are receiving "a black eye" from the association, as the Reliance iCall product harvests negative online reviews.  (Gilbert Dec. ¶ 19; Exhibit 12.)  Further, based upon the defendants' past conduct and the statements made in the declarations of Minesh Patel and Michael Sauer, there is no doubt that, absent a preliminary injunction, the Reliance defendants will continue infringing the iCall® mark.

### E.   **Balance of the Equities**

Balancing the equities requires this Court to "look to the possible harm that could befall the various parties."  *Maxim,* 654 F.Supp.2d at 1036, *citing Cytosport, Inc. v. Vital Pharm., Inc.,* 617 F.Supp. 2d 1051, 1081-1082 (E.D.Cal. 2009).  Denying a preliminary injunction to Plaintiff will result in irreparable harm to its business reputation, as the Reliance Defendants, continue to predate on the good will generated by its unique iCall® VoIP software, depriving Plaintiff of control over its business reputation due to consumer confusion.  (Gilbert Dec. ¶¶ 18 – 19.)  The Reliance Defendants, on the other hand, have stated that that the RelianceiCall.com website is used nearly exclusively to market to expatriate Indian consumers, numbering around one million out of a total client base of over a hundred million.  (Declarations of Minesh Patel and Michael Sauer, Exhibits 22 and 24 to Carreon Dec.)  The balance of the equities clearly tips in favor of granting the injunctive relief to prevent the Reliance Defendants from continue to harvest unfair business advantages to the severe detriment of the business welfare of Plaintiff.

### F.   **Public Policy**

The last factor a court must consider is whether an injunction will favor the public interest in not being deceived or confused.  *Maxim,* 654 F.Supp.2d at 1036, *citing Moroccanoil, Inc. v. Moroccan Gold, LLC,* 590 F.Supp.2d 1271, 1282 (C.D.Cal.2008), *quoting Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 198 (3rd Cir. 1990).  Where the injunction will

eliminate a likelihood of confusion between the marks, "the public interest weighs in favor of granting an injunction." *Maxim at id.* Where the Defendants have sown confusion in the marketplace, the Court will serve the public interest and restore order by securing to Plaintiff, and to Plaintiff alone, the right to offer goods and services in commerce using Plaintiff's suggestive, registered, incontestable iCall® mark.

## IV.   CONCLUSION

Plaintiff's right to the exclusive use of its iCall® mark to offer and sell iCall® VoIP products and services is unquestionable. In a brazen maneuver that might fairly be called "unthinkable," the Reliance Defendants have appropriated Plaintiff's iCall® trademark wholesale, a practice that should be enjoined in any and every form. Accordingly, the Court is respectfully requested to issue a preliminary injunction in the form submitted herewith.


Dated: July 16, 2010                         CHARLES CARREON, ESQ.




_____
Charles Carreon (CSB 127139)
Attorney for Plaintiff iCall, Inc.